UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami-Dade Division

In re:

LIGHTRAY CAPITAL, LLC,

      Debtor.

_____/

Case No. 17-19338-RAM

Chapter 11

In re:

EARNSHAW ASSOCIATES LIMITED,
a British Virgin Islands corporation,

      Debtor.

_____/

Case No. 17-18432-RAM

Chapter 11

In re:

ONE57 79, INC., A New York Corporation,

      Debtor.

_____/

Case No. 17-18433-RAM

Chapter 11

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (A) APPROVING
(I) BIDDING PROCEDURES, BREAK-UP FEE AND EXPENSE REIMBURSEMENT,
(II) THE DEBTORS' ENTRY INTO THE STALKING HORSE APA, (III) FORM AND
MANNER OF SALE NOTICES AND NOTICE PROCEDURES, AND (III) THE
SCHEDULING OF AN AUCTION AND SALE HEARING, AND (IV) THE
PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES (IF ANY), AND (B)  AUTHORIZING AND
APPROVING (I) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES; (II) THE
STALKING HORSE APA; AND (III) THE DEBTORS TO ASSUME AND ASSIGN
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES (IF ANY)**

**(EMERGENCY HEARING REQUESTED FOR
SEPTEMBER 20, 2017)[1]**

---

[1] The Debtors are scheduled to appear at their respective meeting of creditors on September 20, 2017.  Thus, scheduling the Motion on this Court's September 20th calendar will avoid the Estates incurring additional administrative expense while preserving judicial economy as all interested parties are already scheduled to be in Miami, Florida on that date.

The Debtors submit that a hearing on this Motion is necessary on an emergency basis enabling the debtors to obtain Qualified Bids in the next 30 days and schedule an auction shortly thereafter because the Debtors lack the liquidity to satisfy the carrying costs of the Debtors' assets.  Moreover, all interested parties who have expressed an interest in the assets of the Debtors' estates have conditioned their interest and willingness to bid on an expedited sale process with a short timeframe to close on any Court approved sale.  Thus, the Debtors assert that absent the approval of an expedited sale process the Debtors' estates will be unable to maximize the value of the Debtors' assets.

LIGHTRAY CAPITAL, LLC ("Lightray"), EARNSHAW ASSOCIATES LIMITED ("Earnshaw") and ONE57 79, Inc. ("ONE57" and collectively with Lightray and Earnshaw, the "Debtors"), by and through undersigned counsel and pursuant to Sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rules 6004-1 and 6006-1, collectively file this motion (the "Motion") seeking entry of an order authorizing and approving: (a)(i) bidding procedures, and a break-up fee (the "Break-Up Fee") and expense reimbursement (the "Expense Reimbursement") provisions in connection with the Debtors' sale the "Sale") of substantially all of their assets (the "Purchased Assets") pursuant to that certain Term Sheet dated September 14, 2017 (and an Asset Purchase Agreement to be filed with the Court prior to the hearing to consider the relief requested herein (the "Stalking Horse APA")) by and between the Debtors and Brick Capital I, LLC (the "Stalking Horse Bidder"); (ii) the Debtors entry into (but not the consummation at this time of) the Stalking Horse APA; (iii) the form and manner of notice of the Sale; (iv) scheduling and auction (the "Auction") and hearing (the "Sale Hearing") to consider approval of the Sale; and (iv) approving certain procedures for assumption and assignment of executory contracts and unexpired leases ("Executory Contracts and Leases")[2]; and

---

[2]  [2] On September 15, 2017, the Earnshaw Debtor filed its "Schedule G: Executory Contracts and Unexpired Leases" with the Court stating that the Earnshaw Debtor owns a lease executed on or about October 2, 2013 for a berth located at Marina Port Vell S.A.U in Barcelona Spain (the "Berth Lease").  Chapter 11 Case No. 17-18432-RAM [ECF No. 66]. The Berth Lease is the only currently known Executory Contract and Lease.

(b)(i) authorizing the Sale of the Purchased Assets free and clear of any and all claims, liens, rights, interests, and encumbrances to the Stalking Horse Bidder or the party otherwise submitting the highest and best offer pursuant to the Bidding Procedures (in either case, the "Successful Bidder"); (ii) approving the Stalking Horse APA or such other asset purchase agreement entered into with the Successful Bidder in accordance with the Bidding Procedures (the "Successful Bidder APA"); and (iii) authorizing the Debtors to assume and assign certain Executory Contracts and Leases (if any).  In support of this Motion, the Debtors   respectfully states as follows:

## I.      PROCEDURAL BACKGROUND

1.      On July 3, 2017 (the "Petition Date"), an involuntary petition was commenced against Debtors Earnshaw and ONE57 under Chapter 7, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2.      On August 1, 2017, the Court entered an Order for Relief and on August 2, 2017 the Court entered an Order granting the conversion of the cases against Debtors Earnshaw and ONE57 from Chapter 7 to Chapter 11.

3.      On July 25, 2017, Debtor Lightray filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

4.       The Debtors are operating their businesses and managing their affairs as debtors in possession. 11 U.S.C. §§ 1107(a) and 1108. As of the date of the filing of this Motion, no creditors' committee has been appointed in these bankruptcy cases.

---

.

42833562;1
8093220-2

## II.  HISTORY OF LIGHTRAY'S INVOLVEMENT WITH EARNSHAW AND AFFILIATES

5.      Earnshaw and its assets were acquired by Lightray on July 10, 2017 from Aluka Kola in connection with the collection effort of the claim of Campion Maverick, said claim was in the approximate amount of $83,000,000. Lightray had no prior knowledge of Earnshaw and its affiliated companies prior to the beginning of June, 2017 when Lightray's principals became engaged with Campion Maverick to assist in the collection of the $83,000,000 claim.

6.      The acquisition of the Earnshaw stock was accomplished by Lightray so as to create an orderly liquidation of the Earnshaw assets to satisfy Earnshaw's creditors. Consequently, the sales of these assets are "AS IS, WHERE IS" as the acquisition of the Earnshaw stock by Lightray happened on an expedited basis, therefore Lightray's principals insufficient time to complete a normal due diligence in connection with the acquisition of a company that had millions of dollars worth of assets.

## III.  DEBTORS' ASSETS SUBJECT TO PROPOSED SALE PROCESS

7.      The Debtors are soliciting bids from prospective purchasers for the Debtors' right, title, and interest to all of their assets, excluding any litigation claims owned by the Debtors and/or the Debtors' bankruptcy estates (as defined, the Purchased Assets).  The Purchased  Assets include, but are not limited to:

- Real property located at 815 Cima del Mundo, Santa Barbara, California 93108;

- Real Property located at 817 Cima del Mundo, Santa Barbara, California 93108;

- Real property located at 1049 Fifth Avenue, Unit 11B & 12B, Block 1497, Lots 1090 & 1093, New York, New York;

- Real Property located at 157 West 57th Street, Apartment No. 79, Block 1010, Lot 1688, New York, New York;

- Hensen mortor yacht "Galactica Star" flag of the Cayman Islands with official number 743805 (the "Yacht"); and

- The berth, and all rights, related to such berth, located at Marina Port Vell, Barcelona, Spain (the "Berth").

8.      The Debtors assert that the aggregate value of the Purchased Assets exceeds $100,000,000.

## IV.    STALKING HORSE BIDDER

9.      On September 14, 2017, after multiple weeks of arm's length negotiations, the Debtors executed a term sheet (the "Term Sheet") with Brick Capital 1, LLC ("Brick Capital" or "Stalking Horse Bidder") for the Sale of the Purchased Assets for the aggregate purchase price of $84,000,000.  A true and correct copy of the Term Sheet is attached hereto as **Exhibit "A."**

10.     The material terms[3] of the Term Sheet are as follows:

a)  $84,000,000 purchase price;

b)  $50,000,000 of purchase price is allocated to all of the Purchased Assets excluding the Yacht and the Berth;

c)  $34,000,000 of purchase price is allocated to the Yacht and the Berth;

d)  $53,400,000 of the purchase price is paid at closing on the Sale with the remaining $30,600,000 paid upon Stalking Horse Bidder's receipt of the Yacht in Miami, Florida and Stalking Horse Bidder receiving clean title to the Yacht (the "Yacht Conditions");

---

[3] Notwithstanding the summary of the Term Sheet included herein, the Term Sheet shall control as to all terms negotiated between the Debtors and Stalking Horse to the extent of any inconsistencies between the Motion and the Term Sheet.

e) The $30,600,000 portion of the purchase price shall be reduced by .15% per day for every day the Debtors are unable to satisfy the Yacht Conditions (defined in the term sheet) commencing on the 22nd day after entry of an Order approving the Sale of the Purchased Assets;

f) The Stalking Horse Bidder shall fund a $2,000,000 good faith deposit within three (3) business days of the filing of this Motion[4];

g) The Stalking Horse Bidder shall deposit with its bankruptcy counsel or an agreed upon title company trust account an additional $28,000,000 as soon as practicable after the filing of this Motion;

h) The Debtors shall be responsible to fund all taxes, fees, and commissions related to the Sale of the Purchased Assets;

i) The Stalking Horse shall be entitled to a break-up fee/expense reimbursement equal to 3% of the proposed purchase price;

j) The Stalking Horse shall receive an overbid protection equal to the sum of (i) the purchase price, *plus* (ii) the Break-up Fee, *plus* (iii) the sum of 2% of the proposed purchase price;

k) The Debtors shall seek the approval of the bidding procedures set forth herein.

## V.    RELIEF REQUESTED AND BASIS FOR REQUEST

### B.    Proposed Bidding Procedures

11.    The Debtors respectfully request that the Court approve expedited bidding procedures at a preliminary hearing no later than September 20, 2017 in the form attached hereto as **Exhibit "B"** ("Bidding Procedures") in connection with the Sale of the Purchased Assets with

---

[4] Counsel for Stalking Horse Purchase is currently in possession of the $2,000,000 good faith deposit.

42833562;1
8093220-2

a Sale hearing pursuant to Section 363 ("Sale Hearing") to occur on the afternoon of October 18, 2017.  The key proposed bidding procedures[5] are as follows:

- **Qualified Bidder:**  Any person or entity expressing an interest in purchasing the Purchased Assets (a "Potential Bidder") must provide the Debtors shall deliver the following Required Supporting Materials and Good Faith Deposit prior to the Bid Deadline which shall constitute its "Bid" to the Debtors and counsel as follows:

Debtors:

Ronald B. Lewis, Esq.
**LEWIS & THOMAS, LLP**
165 E. Palmetto Park Road, 2nd Floor
Boca Raton, FL 33432
Tel:  561-368-7474
Email: ron@lewisthomaslaw.com


with a copy to:


Eyal Berger, Akerman, LLP, Attorneys for Lightray Capital, LLC
Akerman LLP
350 E. Las Olas Boulevard, Suite 1600
Fort Lauderdale, FL 33301
eyal.berger@akerman.com

- **Required Supporting Materials:**

    i)    **Executed APA**:  An executed asset purchase agreement in the same form and having the same terms as the Stalking Horse APA and reflecting a minimum purchase price $88,200,000 (the "Topping Bid"), together with a markup or redline copy of the Potential Bidder's asset purchase agreement comparing same to the Stalking Horse APA and reflecting any deviations from the Stalking Horse APA.  All consideration paid to acquire the Purchased Assets shall be for cash, with no financing contingencies.

    ii)   **Proof Ability to Close**:  All Potential Bidders must include as part of any bid appropriate evidence that demonstrates to the reasonable satisfaction of the Debtors that such bidder has the financial ability to consummate the transactions contemplated by their APA by the Closing Date including bank statements and financial statements.  No Potential Bidder shall be entitled

---

[5] Notwithstanding the summary of the Bidding Procedures included herein, the Bidding Procedures shall control as to all terms negotiated between the Debtors and Stalking Horse to the extent of any inconsistencies between the Motion and the Bidding Procedures.

42833562;1
8093220-2

to bid and deemed to a Qualified Bidder unless the Debtors determine in their reasonable discretion that the Potential Bidder is financially qualified; provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such bid. **The Potential Bidder shall also provide a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed.**

iii) **Good Faith Deposit:** A Potential Bidder must deliver with its Bid a good faith deposit equal to $2,000,000 in the form of a wire transfer or certified or cashier's check (the "Good Faith Deposit") payable to the trust account for the attorneys for the Debtors.

**A Potential Bidder satisfying the above requirements shall be deemed to be a Qualified Bidder and to have submitted a "Qualified Bid".**

**THE BID DEADLINE SHALL BE October 13, 2017 AT 5:00 P.M. EST.**

**Auction.** An auction (as defined, the Auction) of the Purchased Assets shall be conducted by the Debtors in the event there is at least one Qualified Bidder. The Auction shall take place on October 17, 2017 at 10:00 a.m. EST at the law offices of Akerman LLP, 350 E. Las Olas Blvd., Suite 1600 (16th Floor), Ft. Lauderdale, FL 33301.

**Final Sale Hearing.** A Final Sale hearing shall be conducted by the Court on October 18, 2017.

**ONLY A QUALIFIED BIDDER WHO HAS SUBMITTED A QUALIFIED BID WILL BE ELIGIBLE TO PARTICIPATE AT THE AUCTION.**

**The Qualified Bidder is not entitled to any break-up fee, termination fee or similar type of payment or reimbursement.**

**Bidding Increment.** The minimum bidding increment at the auction shall be $100,000 or such other amount as the Debtors determine is appropriate. The Debtors reserve the right to change the bidding increments at the Auction.

**Baseline Bid / Overbid Protection.** In the event there are one or more Qualified Bidders and an Auction is held, the Baseline Bid will be the sum of the Qualified Bid which proposes the highest and best economic consideration to the Debtors in the Debtors' sole business judgment.

**Acceptance of Qualified Bid.** The Debtors presently intend to consummate the Sale with the Stalking Horse Bidder if there is no Auction. Otherwise, if an Auction is held the Debtors shall determine who has made the highest and best offer (the "Successful Bidder")

8

and the Debtor is authorized to accept Back-Up bids.  However, the Debtors' presentation to the Bankruptcy Court for approval of the bid made by the Successful Bidder does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted such Bid only when such bid has been approved by order of the Bankruptcy Court.

**Reservation of Rights.** At the conclusion of the Auction the Debtors shall determine which bid, if any, is the highest or otherwise best offer, and (i) may reject at any time, any bid that the Debtors determine in their sole discretion to be: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale transaction, or (c) contrary to the best interests of the Debtors, their estates and creditors.

**Return of Deposits**. The Good Faith Deposit of a Qualified Bidder shall be returned within three business days of the earlier of (a) the closing of a Sale transaction on all or a portion of the Purchased Assets on which the Qualified Bidder made a bid or (b) 30 days after the Sale Hearing.

12.     The Bidding Procedures are intended to provide a flexible process allowing the Debtors to maximize the value of their Purchased Assets given the severe liquidity constraints they currently face. The Debtors expressly reserve the right to modify the relief requested in this Motion prior to or at the applicable hearings, including modifying the proposed Bidding Procedures. Moreover, the Debtors reserve the right to adjourn the Auction or the Sale Hearing if the Debtors determine that such action will maximize value to their estates.

### C.     The Sale Terms Were Negotiated in Good Faith

13.     Although the Bankruptcy Code does not define "good faith purchaser", courts, in construing section 363(m), have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'". *In re Abbott's Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Vanguard Oil & Serv. Co.*, 88 B.R. 576, 580 (E.D.N.Y. 1988).

14.     The Term Sheet is the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder and is on commercially reasonable terms.  The Debtors and

9

the Stalking Horse Bidder, and their respective professionals, negotiated the terms of the Agreement over the course of several weeks.  Further, the Stalking Horse Bidder has no connections or affiliations with the Debtors, their affiliates, any of their current or former officers, any of their current or former directors, or any of their current or former members.

15.    All negotiations were undertaken in good faith and in compliance with the Bankruptcy Code.  Accordingly, the Debtors request a finding that the transaction contemplated by the Term Sheet is (a) subject to the protections afforded to "good faith" purchasers under section 363(m) of the Bankruptcy Code, and (b) not subject to avoidance under section 363(n) of the Bankruptcy Code.

### D.    Proposed Shortened Notice of the Sale Hearing

16.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the hearing on this Motion seeking approval of the Sale of the Purchased Assets.  The notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested. However, pursuant to Federal Rule of Bankruptcy Procedure 9006(c), the Court has the authority to limit that notice period based on cause shown. Because of the exigent circumstances facing the Debtors, the Debtors submit that cause exists for the shortened notice period requested herein and thus are seeking to have the Court approve the relief sought herein on the limited notice requested.  In any event, parties with standing will have an opportunity to object at the final sale hearing (as defined, the Sale Hearing).

17.    The Debtors have served, or will serve, this Motion on: (a) the Office of the United States Trustee; (b) counsel to Banque Havilland S.A.; (c) each of the creditors listed on the schedules filed by the Debtors with the Court and any creditor which has filed a proof of claim and any other known creditors and interest holders of the Debtors; (d) all parties known to be

10

asserting a lien in the Debtors' assets; (e) all counterparties to executory contracts and unexpired leases potentially to be assumed and assigned (if any); and (f) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities wherever located that, as a result of the Sale of the Purchased Assets, may have claims, contingent, or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any known interest in the relief requested by the Motion ; (g) counsel to any Committee which may be formed; (h) any party that has filed a notice of appearance with the Court in the Debtors' cases requesting notice pursuant to Bankruptcy Rule 2002; (i) all counterparties to any Executory Contract or Lease of the Debtors (if any); and (j) all potential bidders previously identified or otherwise known to the Debtors.

18.     The Debtors also will serve by regular mail, email and facsimile on the foregoing persons a notice of the Auction and the Sale Hearing (the "Auction and Hearing Notice"), which includes, among other things, the date, time and place of the Auction and the Sale Hearing and information for how to learn about the deadline for filing any objections to the relief requested herein once they are set by the Court, and, therefore, complies with Bankruptcy Rule 2002(c).

19.     Within 24 hours after the conclusion of the Auction, the Debtors will file a notice identifying the Successful Bidder(s) and any Backup Bidders (the "Notice of Successful Bidder") with the Court.

20.     The Debtors submit that the methods of notice described in this Motion comply fully with Bankruptcy Rule 2002 in terms of the form of notice required and submit that the exigencies presented by the facts and circumstances of the case necessitate and therefore justify the limited notice period for the proposed Bidding Procedures and the Sale of the Purchased Assets.

42833562;1
8093220-2

Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

## VI.     SALE OF THE DEBTORS' ASSETS IS WARRANTED PURSUANT TO SECTION 363 OF THE CODE.

21.     The Bankruptcy Code provides that a debtor in possession may sell property of its estate outside of the ordinary course of its business, subject to the approval of the court after notice and a hearing. *See* 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor. *See Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such action.").  Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. 11 U.S.C. § 105(a).

22.     Courts typically consider four factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good

faith. *See, e.g., In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

23.     Here, each of these four factors has been satisfied. First, sound business reasons exist for the Debtors' efforts to sell their assets. The Debtors currently have inadequate liquidity to continue operating, maintaining, and preserving their assets. A rapid, but orderly sale of the Purchased Assets will minimize the liquidity the Debtors need to continue operations while providing a way for the Debtors to monetize their assets for the benefit of all creditors. Second, as discussed above, the Debtors will be providing adequate and reasonable notice to interested parties of the opportunity to bid on the Purchased Assets and of the opportunity to object to the sale of those Purchased Assets. *See*, *e.g.*, *Folger Adam Security Inc. v. DeMatteis/MacGregor*, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it includes "the time and place of any public sale, the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property"). Third, the proposed Bidding Procedures provide for an open and competitive bidding process for the Purchased Assets and are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchased price under the circumstances.. Fourth, the Debtors are proceeding in good faith and will make a showing at the Sale Hearing that the purchaser or purchasers of the Purchased Assets have acted in good faith. The Stalking Horse APA has been extensively negotiated between the parties at arm's length and in good faith and confers substantial benefits on the Debtors' estate that would likely not be available in the event of a liquidation of the Debtors' assets.  Accordingly, the Auction and sale of the Purchased Assets pursuant to the proposed Bidding Procedures should be approved.

42833562;1
8093220-2

## VII.    SALE OF ASSETS FREE AND CLEAR OF CERTAIN LIENS, CLAIMS AND ENCUMBRANCES.

24.     Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property under Bankruptcy Code Section 363(b) free and clear of liens, claims and encumbrances if one of the following conditions is satisfied: (i) applicable nonbankruptcy law permits the sale of the property free and clear of such interest; (ii) the entity holding the lien, claim or encumbrance consents to the sale; (iii) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 U.S.C. § 363(f). *See In re Smart World Tech., LLC*, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests. It thus allows purchasers ... to acquire assets [from a debtor] without any accompanying liabilities"); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

25.     To facilitate the sale of the Purchased Assets, the Debtors request that the Court authorize their sale free and clear of liens, claims, encumbrances, and other interests (collectively, "Liens") at the Sale Hearing to be scheduled in 35 days and immediately after the proposed Auction Date for the purpose of hearing, pursuant to Section 363 of the Bankruptcy Code, the Debtors request to sell their Purchased Assets free and clear of liens. The sale of the Purchased Assets pursuant to the Bidding Procedures will have satisfied at least one of the prongs of Section 363(f).

26.     The Debtors believe that Section 363(f)(5) is satisfied because (i) any entity holding a lien on the Purchased Assets could be compelled to accept a monetary satisfaction of its liens,

and (ii) the Debtors propose that any lien on the Purchased Assets sold shall attach to the net proceeds of the sale of the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto. As such, the sale of the Purchased Assets free and clear of all liens satisfies Section 363(f)(5) of the Bankruptcy Code.

27.     In addition, the Debtors submit that the Purchased Assets may be sold free and clear of all successor liability claims.  Notwithstanding reference to the conveyance free and clear of "any interest" in Section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well.  *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); *Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), *aff'd*, 805 F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(1) barred successor liability for products defect claim).

## VIII.   THE SUCCESSFUL BIDDER SHOULD BE AFFORDED ALL PROTECTIONS UNDER SECTION 363(m) AS A GOOD FAITH PURCHASER

28.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal

11 U.S.C. § 363(m).  *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency

of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to

11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal

unless there is a stay pending appeal")

29.     Although the Bankruptcy Code does not define "good faith," one court has held

that:

> the good faith of a purchaser is shown by the integrity of his conduct during
> the course of the sale proceedings; where there is a lack of such integrity, a
> good faith finding may not be made. A purchaser's good faith is lost by
> 'fraud, collusion between the purchaser and other bidders or the trustee, or
> an attempt to take grossly unfair advantage of other bidders.

126 F.3d at 390 (quoting *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th

Cir. 1978)); *see also In re Andy Frain Services, Inc.,* 798 F.2d 1113, 1125 (7th Cir. 1986).

30.     Here, the Stalking Horse APA was an arm's length negotiated transaction in which

the Stalking Horse Bidder acted in good faith and without collusion or fraud of any kind.

Furthermore, the Debtors and the Stalking Horse Bidder are not entering into the Stalking Horse

APA for the purpose of hindering, delaying or defrauding any creditor.  The Debtors will be

making the similar offer, if appropriate, for the Successful Bidder.

31.     Moreover, the selection of the Successful Bidder will be the result of a marketing

process and extended arm's-length, good-faith negotiations.  The Debtors will be advised by its

legal and financial advisors throughout the process.  The Successful Bidder will be selected by the

Debtors after the Debtors' review of indications of interest by all potential purchasers,

negotiations, and the Debtors' determination that the offer of the Successful Bidder is the most

favorable offer submitted for the Purchased  Assets.  Accordingly, the Debtors request that the

Court make a finding that the Stalking Horse Bidder or Successful Bidder, if appropriate, is entitled

to the protections of section 363(m) of the Bankruptcy Code.

## IX. THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT ARE REASONABLE AND SHOULD BE APPROVED

32.     An expense reimbursement may be approved when it provides some post-petition benefit to the debtor's estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 536 (3d Cir. 1999). The *O'Brien* court determined that a break-up fee provides an actual benefit to a debtor's estate in two circumstances. The first such circumstance is where "assurance of a break-up fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, when bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*.

33.     The paramount goal in any proposed sale of property of a debtor's estate is to maximize the proceeds received by the estate. *See, e.g., Food Barn Stores*, 107 F.3d at 564-65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992). Courts recognize that procedures intended to enhance competitive bidding are consistent with this goal. *See id*. (such procedures "encourage bidding and maximize the value of the debtor's assets"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("break-up fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking").

34.     In *O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee and expense reimbursement: (1) the presence of self-dealing or manipulation in negotiating the break-up fee and expense

17

reimbursement; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee and expense reimbursement relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee and expense reimbursement "to attract or retain a potentially Prevailing Bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors' committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See O'Brien*, 181 F.3d at 536.

35.    Approval of breakup fees, expense reimbursements and other forms of bidding protection in connection with the sale of significant assets pursuant to Section 363 of the Bankruptcy Code has become an established practice in Chapter 11 cases.   Three different approaches have been used by the bankruptcy courts in assessing the validity and enforceability of bidding incentives.   The first approach – the business judgment test – is based on the corporate control cases and applies the business judgment rule to make certain that bidding is promoted, not deterred and that the fees are reasonable in relationship to the size of the transaction and the bidder's efforts.  *See In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Col. 1992); I*n re Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 S.D.N.Y. 1992), appeal dismissed, 3 F. 3d 49 (2d Cir. 1993); *In re 995 Fifth Avenue Assocs.*, LP. 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989); *see also Cottle v. Stores Communications, Inc.*, 849 F. 2d 570 (11th Cir. 1988) (using business judgment test in corporate control context).   This approach also has been

18

endorsed by a leading bankruptcy treatise.  *See* 3 Collier on Bankruptcy § 363.02[6] at 363-21 (15th ed. 2005) (courts "should approve [bidding incentives] unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.").  The second approach – the best interests of the estate test – focuses on whether the bidding incentive at issue is in the best interests of the estate to ensure that the debtor's estate is not unduly burdened and that the relative rights of the parties are protected.  *See In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995.  The third approach – the administrative claim test – considers whether the bidding incentive at issue is "actually necessary to preserve the value of the estate."  *See In re O'Brien Environmental Energy*, Inc., 181 F. 3d 527, 535 (3d Cir. 1999), *see also AgriProcessors, Inc.. v. Iowa Quality Beef Supply Network, L.L.C. (In re Tama Beef Packing, Inc.)*, 290 B.R. 90, 97-98 (B.A.P. 8th 2003); *In re Dorado Marine, Inc.*, 332 B.R. 637 (M.D. Fla. 2005).

36.     The Debtors submit that the foregoing factors are met under the facts and circumstances of the chapter 11 case, as the proposed Break-up Fee and Expense Reimbursement are necessary to the success of the Auction and sale process and therefore provide an actual benefit to the Debtors' estates. The Break-up Fee and Expense Reimbursement are reasonable in light of the efforts and expenses that the Stalking Horse Bidder has undertaken. The Break-up Fee and Expense Reimbursement were negotiated at arm's length and in good faith and are commensurate with the real and substantial benefit provided to the Debtors' estate and are fair and reasonable in light of the size and nature of the proposed sale transaction. Importantly, the protections provided by the Break-up Fee and Expense Reimbursement were a necessary inducement for the Stalking Horse Bidder to enter into the Term Sheet (and the Stalking Horse APA). Without the Stalking Horse APA, it would be challenging to maximize the value of the Purchased Assets because the

Stalking Horse APA provides a "floor" purchase price for all of the Debtors assets. By agreeing to the Break-up Fee and Expense Reimbursement, and thereby securing the Stalking Horse Bidder's bid, the Debtors hope to induce the submission of additional bids that otherwise may have never been made and without which bidding may have been limited. The Break-up Fee and Expense Reimbursement not only were, and are, a material inducement for, and condition of, the Stalking Horse Bidder's offer to purchase the Purchased Assets, but also a precondition to the Stalking Horse Bidder's commitment to hold open its offer.

37.     The Debtors submit that the proposed Break-up Fee and Expense Reimbursement will not chill bidding, are reasonable, and will enable the Debtors to maximize the value of their estates.  The amount of the Expense Reimbursement constitutes "a fair and reasonable percentage of the proposed purchase price." *In re S.N.A. Nut Co.*, 186 B.R. 98, 103 (Bankr. N.D. Ill. 1995). The Expense Reimbursement is customary for similar transactions of this type in the bankruptcy context and not "so substantial that it provides a 'chilling effect' on other potential bidders."*Id.*; *see also In re Wintz Companies*, 230 B.R. 840, 847 (B.A.P. 8th Cir. 1999).

38.     In sum, the Break-Up Fee and Expense Reimbursement provided for in the Stalking Horse APA were the product of arm's-length negotiations between the Debtor and the Stalking Horse Bidder, and were in fact required by the Stalking Horse Bidder as a condition to entry into the Stalking Horse APA. The Debtor respectfully submits that such protections are warranted in light of Stalking Horse Bidder's agreement to serve as the "stalking horse" in the Sale.

## X.    THE COURT SHOULD WAIVE OR REDUCE THE PERIODS REQUIRED BY RULES 6004(H) AND 6006(D) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

39.     Pursuant to Rule 6004(h) (formerly Rule 6004(g)) of the Bankruptcy Rules), all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless the court orders otherwise. Fed. R.

Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).

40.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, a leading treatise suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately if there is a showing of a sufficient need to close the sale within the 14-day period. 10 Collier on Bankruptcy § 6004.10 (15th ed. 2007).

41.    In light of the Debtors' liquidity restraints and to limit the costs of administering the Debtors' estates, it is critical that the Debtors close the sale of the Purchased Assets as soon as possible, otherwise the potential for a public auction sale and distributions to creditors could be lost.

42.    Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## XI.    ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

43.    The assumption and assignment of the Debtors' Executory Contracts and Lease is an integral part of the proposed sale and should be approved by the Court.[6] Section 365(a) of the

---

[6] On September 15, 2017, the Earnshaw Debtor filed its "Schedule G: Executory Contracts and Unexpired Leases" with the Court stating that the Earnshaw Debtor owns a lease executed on or about October 2, 2013 for a berth located at Marina Port Vell S.A.U in Barcelona Spain (the "Berth Lease").  Chapter 11 Case No. 17-18432-RAM [ECF No. 66]. The Berth Lease is the only currently known Executory Contract and Lease.

42833562;1
8093220-2

Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). By enacting section 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *Leland v. Gardinier, Inc. (In re Gardinier, Inc.)*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *Chira v. Saal (In re Chira)*, 367 B.R. 888, 898 (S.D. Fla. 2007); *In re Sandman Assocs.*, LLC, 251 B.R. 473, 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not").

44.    It is well established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor. *See Gardinier, Inc.*, 831 F.2d at 976 n.2; *Chira*, 367 B.R. at 898; *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) (noting that "[i]n determining whether a debtor may be permitted to reject an executory contract, courts usually apply the business judgment test. Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business judgment will not be altered") (citations omitted); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Sharon Steel Corp. v. National Fuel Gas Dist Corp.*, 872 F.2d 36, 40 (3d Cir. 1989). Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *In re*

*Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

45.     Adequate business justification exists to merit judicial approval of the proposed assumption and assignment of the Debtors' Executory Contracts and Leases.   The Debtors' Executory Contracts and Leases are valuable assets of the Debtors' estates and represent an integral part of any proposed transaction for the sale of the Purchased Assets.   To the extent that the Debtors can sell them as part of the sale, the sales will generate cash which the estates can use to satisfy claims and reduce potential claims against the estates.

46.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign an executory contract if the Debtor:

> 1.  (A)     cures, or provides adequate assurance that [it] will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
> 2.  (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> 3.  (C)     provides adequate assurance of future performance under such contract or lease. . . .
> 4.  (f)(2) The trustee may assign an executory contract or unexpired lease of the debtor only if —
> 5.  (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

42833562;1
8093220-2

*See* 11 U.S.C. §§ 365(a), (b)(1), (f)(2).  Accordingly, section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments of executory contracts and unexpired leases, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided.

47.    It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance.  *See, e.g., In re Glycogensys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee"); *Carlisle Homes, Inc. v. Arrari (In re Carlisle  Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Natco  Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (same). The Debtors respectfully submit that the procedures governing the Sale are appropriate and reasonably tailored to provide counterparties to the Executory Contracts and Leases---which is known by the Debtors to be comprised only of the Berth Lease---with adequate notice of the proposed assumption and assignment of their contracts and leases, and ultimately, this Court would decide any dispute regarding the cure amount pau

48.    The Debtors submit that the assumption and assignment of such Executory Contracts and Leases---which is known by the Debtors to be comprised only of the Berth Lease---to the Stalking Horse Bidder or other Successful Bidder, as applicable, as of the closing date of the Sale is necessary to the consummation of the Sale and is well within the Debtors' sound business judgment.  Accordingly, the Debtors submit that the assumption and assignment to the

Stalking Horse Bidder or other Successful Bidder of the Executory Contracts and Leases should be approved as an exercise of the Debtors' sound business judgment.

## XII.    NOTICE

49.    On an expedited basis, notice of this Motion has been given to (a) the Office of the United States Trustee, (b) all other parties known to be asserting a lien in the Debtors' assets, (c) all of the known creditors in the Debtors' chapter 11 cases, (d) all counterparties to executory contracts and leases that may be assumed and assigned, and (e) various federal and state tax authorities, including the Internal Revenue Service.

50.    Based on the exigent circumstances described above, the Debtors respectfully submit that such notice is sufficient and request that this Court find that no further notice of the relief requested herein is required.

51.    In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## **CONCLUSION**

For all the foregoing reasons, the Debtors respectfully request the Court grant the relief requested in this Motion in all respects, and grant such other and further relief as the Court deems just and proper.

Dated:  September 15, 2017                        Respectfully submitted,


                                                  By:  /s/  *Ronald B. Lewis*
                                                  Ronald B. Lewis, Esq.
                                                  Florida Bar No. 807958
                                                  **LEWIS & THOMAS, LLP**
                                                  165 E. Palmetto Park Road, 2nd Floor
                                                  Boca Raton, FL 33432
                                                  Tel:  561-368-7474
                                                  Email: ron@lewisthomaslaw.com

                                                  Attorneys for Debtors

42833562;1
8093220-2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 15, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record or pro se parties who are authorized to receive electronically Notices of Electronic Filing in this bankruptcy case as listed on the below service list.


By: /s/  *Ronald Lewis*
Ronald Lewis, Esq.


## SERVICE LIST

**17-18432-RAM Notice will be electronically mailed to:**

Joel M. Aresty, Esq. on behalf of Petitioning Creditor Campion Maverick Inc
aresty@mac.com

Leyza F. Blanco, Esq. on behalf of Creditor Banque Havilland S.A.
leyza.blanco@gray-robinson.com, Jennifer.Mahaffey@gray-robinson.com;Amador.Ruiz-Baliu@gray-robinson.com

David H DeCelles on behalf of Interested Party United States of America
david.h.decelles@usdoj.gov

Robert M Kline on behalf of Interested Party ROFU Ocean LLC
rkline@mwe.com, mcabo@mwe.com;apumariega@mwe.com;jkohlasch@mwe.com

Ronald Lewis, Esq on behalf of Debtor Earnshaw Associates Limited, a British Virgin Islands Corporation
rlewis@beltlawyers.com,
reception@beltlawyers.com;mj@beltlawyers.com;linda@beltlawyers.com;lindath714@gmail.com;r40624@notify.bestcase.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Steven D Schneiderman on behalf of U.S. Trustee Office of the US Trustee
Steven.D.Schneiderman@usdoj.gov

**17-18432-RAM Notice will not be electronically mailed to:**

Kurt F. Gwynne
1201 Market St #1500
Wilmington, DE 19801

42833562;1
8093220-2

# Exhibit A

.

Execution Version

**Term Sheet for Asset Purchase Agreement**

**("Term Sheet")**

**September 14, 2017**

| Term | Description |
|---|---|
| **Sellers/Debtors** | Lightray Capital, LLC ("Lightray"), Earnshaw Associates Limited ("Earnshaw"), and One57 79, Inc. a New York Corporation ("One57"), and each of their respective current and future affiliates and subsidiaries of (whether or not wholly-owned). |
| **Buyer – Stalking Horse Bidder** | Brick Capital 1 LLC or one of its affiliates or assignees (together with each of their respective permitted successors, designees, assigns and investors). |
| **Purchase Price** | The purchase price of $84 million is comprised of the following components:<br><br>• Purchased Assets (defined below) Other Than the Yacht (defined below): $50 million, to be paid by the Buyer to the Sellers upon the date of the closing of the sale of the Real Estate (defined below) to the Buyer.<br><br> o *Option Granted to the Buyer with Respect to the Secured Debt Related to the Wamdara Property (defined below)*: The Debtors grant to the Buyer an option to assume the secured debt related to the Wamdara Property, and if the Buyer exercises the option and is able to assume such debt, the Buyer shall have the right to reduce the cash portion of the $50 million purchase price by the amount paid by the Buyer to satisfy the secured debt related to the Wamdara Property.<br><br>• Yacht: $34 million, to be paid by the Buyer to the Sellers as follows:<br><br> o $3.4 million to be paid by the Buyer to the Sellers upon the closing date of the sale. The Buyer agrees to fund all reasonable expenses of the Yacht after the closing.<br><br> o $30.6 million to be paid by the Buyer to the Sellers upon (i) the Buyer's receipt of the Yacht at a berth located in Miami, Florida (the "Miami Berth Condition"), and (ii) the Sellers providing the Buyer clear title to the Yacht without any restrictions or |

1

Execution Version

| Term | Description |
|---|---|
| | limitations whatsoever by any jurisdiction in the world ("Clear Title Condition" and together with the Miami Berth Condition", collectively, the "Yacht Conditions"); *provided, however,* that the $30.6 million purchase price will be reduced by .15% per day (the "Purchase Price Reduction") so long as the Yacht Conditions have not been satisfied by the Sellers, *provided further, however,* the Purchase Price Reduction shall commence on the twenty-second (22nd) day after the Bankruptcy Court enters the sale order, regardless of whether such sale order is appealed or stayed (e.g., if the sale order is entered on November 1st, the Purchase Price Reduction shall commence on November 23rd if the Yacht Conditions are not yet satisfied by the Debtors by that date, regardless of whether the sale order is appealed or stayed). |
| **Good Faith Deposit** | $2 million.  Within three (3) business days after the Debtors file a motion to approve this stalking-horse bid and the bidding procedures/sale process, the Buyer agrees to deposit the Good Faith Deposit, at the sole discretion of the Buyer, into the attorney trust account of the Buyer's counsel or the equivalent (e.g., title company trust account). |
| **Total Deposit** | $30 million (inclusive of the amount of the Good Faith Deposit).  As soon as practicable after the Debtors file the motion to approve this stalking-horse bid and the bidding procedures/sale process and prior to the Court's hearing to consider such motion, the Buyer agrees to deposit the remaining amount of the Total Deposit, at the sole discretion of the Buyer, into the attorney trust account of the Buyer's counsel or the equivalent (e.g., title company trust account). |
| **Purchased Assets** | All of the Debtors' properties and assets of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Debtors' business or otherwise, other than the excluded assets, including but not limited to, the assets listed by the Debtors on their respective schedules filed with the Bankruptcy Court as may be amended (*see* Lightray (Chapter 11 Case No. 17-19338-RAM, ECF No. 11) Earnshaw (Chapter 11 Case No. 17-18432-RAM, ECF Nos. 48, 55) and One57 (Chapter 11 Case No. 17-1843-RAM, ECF No. 36)) as well as a berth, and all rights associated with such berth, located at Marina Port Vell, Barcelona, Spain. |

Execution Version

| Term | Description |
|---|---|
| | The Purchased Assets include, but are not limited to: |
| | • Yacht: *Galactica Star* (the Debtors' yacht currently berthed in Mexico) (the "Yacht"). |
| | • Real Property: (i) real property located at 157 West 57th Street, Unit No. 79, New York, New York (the "157 West 57th Street Property"), (ii) the Debtors' ownership of 49% of the stock of 1049 5th Avenue, Inc. (which assets include, among other things, real property located at 1049 Fifth Avenue, Unit 11B and 12B, New York, New York) (the "1049 5th Avenue Property"), and (iii) the Debtors' ownership of 49% of the stock in Wamdara, Inc. (which assets include, among other things, real property located at 815 Cima del Mundo Road and 817 Cima del Mundo Road, Santa Barbara, California) (the "Wamdara Property" and together with the 157 West 57th Street Property and the 1049 5th Avenue Property, collectively, the "Real Property"). |
| **Excluded Assets** | The Debtors' causes of action, including all causes of action arising under chapter 5 of the Bankruptcy Code. |
| **Allocation of Purchase Price** | • All Purchased Assets Other than the Yacht (including the Real Property): $50 million of the Purchase Price.<br><br>• Yacht: $34 million of the Purchase Price, comprised of (i) $3.4 million as of the closing of the sale and (ii) $30.6 million upon satisfaction by the Sellers of the Yacht Conditions, subject to the Purchase Price Reduction. |
| **Taxes/Fees/Commissions** | The Sellers agree to pay all taxes, fees, and commissions related to this transaction, including but not limited to transfer taxes and brokerage fees and commissions (including, but not limited to any fees, commissions or expenses the Debtors may owe now or in the future to Ksenia Kuzmenko Real Estate Broker or Oxford Property Group (*see* One57 (Chapter 11 Case No. 17-18433-RAM, ECF No. 30)). |
| **Break-Up Fee/Expense Reimbursement** | 3% of the Purchase Price. |
| **Initial Overbid** | The sum of the following: (i) the Purchase Price; *plus* (ii) the Break-Up Fee/Reimbursement of Expenses; *plus* (iii) and overbid amount equal to 2% of the Purchase Price.<br><br>All competing bidders are required to match the Allocation of |

Execution Version

| Term | Description |
|---|---|
| | Purchase Price in the Initial Overbid and subsequent overbids. |
| **Assumption and Assignment of Contracts and Leases** | The Sellers affirmatively represent that they have no executory contracts or leases. |
| **Assumed Liabilities** | None; provided, however, the Sellers have granted the Buyer the options described in the Purchase Price. |
| **Successor Liability** | The Buyer is not assuming any liabilities or obligations which the Buyer may or could become liable for as a result of or in connection with any theories of liability. |
| **Sale Free and Clear of All Liens** | The Sellers shall sell all of the Purchased Assets free and clear of all liens (other than permitted encumbrances expressed identified in the sale order). |
| **Relief from Bankruptcy Rule 6004(h)** | The Sellers will seek a waiver of the 14-day stay under Bankruptcy Rules 6004(d) and 6004(h). |
| **Asset Purchase Agreement** | The Sellers and Buyers will negotiate in good faith an *Asset Purchase Agreement* containing the terms contained in this Term Sheet and other terms mutually agreed upon by the Sellers and the Buyer.  The Sellers and Buyer will use their best efforts to file the *Asset Purchase Agreement* with the Bankruptcy Court not later than September 22, 2017. |
| **Milestones** | Hearing, re: Approval of stalking-horse bid/bidding procedures: *Not later than September 22, 2017* |
| | Service of Bidding Procedures Order: *+ 3 days from entry of Bidding Procedures Order* |
| | Bid Deadline: *October 13, 2017* |
| | Auction: *October 17, 2017* |
| | Sale Hearing: *October 18, 2017* |
| | Deadline to Close Sale:  *+12 days from entry of order approving sale* |

If the above is acceptable to the Debtors/Sellers, please sign and return the enclosed copy of this Term Sheet to the Buyer no later than the close of business on September 14, 2017.

*Acknowledged, Accepted, and Agreed to:*

**SELLERS:**  **LIGHTRAY CAPITAL, LLC**

By: Ali Farooq
Its:

**EARNSHAW ASSOCIATES LIMITED**

By: Ali farooq
Its:

**ONE57 79 INC. A NEW YORK CORPORATION**

By:
Its: Ali farooq

**BUYER:**  **BRICK CAPITAL 1 LLC**

By: Jonah Lichter
Its: Managing Member

5

# Exhibit B

# BIDDING PROCEDURES

The following procedures (the "<u>Bidding Procedures</u>") will govern the competitive process run by Earnshaw Associates Limited ("<u>Earnshaw</u>") and its debtor affiliates including Lightray Capital, LLC ("<u>Lightray</u>"), and One57 79, Inc. a New York Corporation ("<u>One57</u>") (Earnshaw, Lightray and One57, collectively, the "<u>Debtors</u>") to solicit bids for the sale of all of the Debtors' assets (collectively, the "<u>Acquired Assets</u>").

The Bidding Procedures provided herein shall be the exclusive mechanism governing the auction process related to the sale of the Acquired Assets.

## Bidding Process

### A.    *Due Diligence*

The Debtors may afford any prospective acquirers the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors, in their reasonable discretion. Prospective acquirers will be afforded the opportunity to conduct due diligence in a manner no less favorable than that provided to the Stalking Horse Bidder (defined below).

The Debtors have reached out to certain parties who have either expressed an interest in making a bid or who the Debtors believe may have an interest in making a bid for the Acquired Assets. The Debtors shall also contact such other parties, provided the Debtors have not already contacted such parties.

The Debtors shall coordinate all reasonable requests for additional information and due diligence access from interested parties. All due diligence requests by the interested parties shall be directed to LightRay Capital, LLC, Attn: Jason Rosen, Email: jason@lightraycompanies.com.

### B.    *Public Announcement of Auction and Funding of Deposits*

On or before **October 4, 2017**, the Debtors shall (i) issue a press release that contains a notice (the "<u>Notice of Auction</u>") of an auction for the Acquired Assets (the "<u>Auction</u>"), which Notice of Auction will include all deadlines related thereto and (ii) serve the Notice of Auction on all parties in interest and those parties who request notice.

The Notice of Auction shall provide notice to all interested parties that in order to participate in the bidding process and the Auction and be deemed a Qualified Bidder (as defined below), each potential bidder (each, an "<u>Interested Party</u>") must provide a cash deposit in the amount of $4,000,000 (the "<u>Deposit</u>") on or before October 13, 2017, with the Escrow Agent (as defined below) pursuant to an Escrow Agreement (as defined below) to be provided by the Debtors to the Interested Parties.

C.    ***Bids***

Each Interested Party, other than the Stalking Horse Bidder, must deliver a written and duly executed offer (a "Bid"), **so as to be received by no later than 3:00 p.m. (Prevailing Eastern Time) on October 13, 2017** ("Bid Deadline") to the following address (the "Bid Notice Party"):

Eyal Berger, Esq.
Akerman LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999
Dir: 954.712.6071
eyal.berger@akerman.com

All Bids must be for all of the Acquired Assets for cash or other consideration; provided, however, that each Bid must be premised on acceptance by the Debtors and approval by the Bankruptcy Court.

The Debtors and their professionals will deliver the Bids received not later than one (1) business day following receipt of the Bid to counsel for the Stalking Horse Bidder:  c/o Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com, tel. 305.714.4343) and Christopher A. Jarvinen, Esq. (cjarvinen@bergersingerman.com; tel. 305.714.4363).

Each Bid must:

1.    state that such Interested Party offers to purchase the Acquired Assets;

2.    state that such Interested Party's Bid is not subject to any further due diligence and that such Interested Party has obtained all necessary financing and approvals, and include evidence of authorization and approval from the Interested Party's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Bid and transactions contemplated thereby, including evidence of a binding commitment to provide financing, subject only to customary conditions (which shall not include diligence, credit approvals, or syndication);

3.    fully disclose the identity of each party that will be participating in connection with such Bid, and the complete terms of any such participation;

4.    not include (i) a right to request or entitlement to any commitment payment, break-up fee or similar type of payment or (ii) reimbursement of fees and expenses other than in connection with the implementation of the Bid if the Interested Party is the Successful Bidder (as defined below);

2

5.    contain confirmation that the Bid has received any necessary internal approvals to make a binding Bid;

6.    include a mark-up of the Asset Purchase Agreement, which will be filed with the Bankruptcy Court on or before October 4, 2017 and provided by the Debtors to the Interested Parties (such form, the "Form Asset Purchase Agreement").

For the avoidance of doubt, the Stalking Horse Bidder has already satisfied the conditions described in subparagraphs (1) to (6) of this paragraph C.

Each Interested Party providing a Bid shall be deemed to acknowledge and represent that it has had an opportunity to conduct due diligence on the Debtors prior to making its Bid; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its Bid; and that it did not rely upon any written or oral statement, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtors, or the completeness of any information provided in connection therewith.

Within one (1) business day following entry by the Bankruptcy Court of an order approving the Bidding Procedures contained herein, the Debtors shall provide copies of all bids or other indications of interest for the Acquired Assets received by the Debtors prior to entry of such order to the professionals for the Stalking Horse Bidder.

**FOR THE AVOIDANCE OF DOUBT, ANY AND ALL PARTIES SHOULD BE AWARE THAT ANY PARTY THAT DOES NOT SUBMIT A BID BY THE BID DEADLINE WILL NOT BE ALLOWED TO (1) PARTICIPATE IN THE AUCTION UNDER ANY CIRCUMSTANCES OR (2) SUBMIT ANY OFFER AFTER THE BID DEADLINE.**

D.    **_Deposits_**

The submission of a Bid by the Bid Deadline shall and must be accompanied by the $4,000,000 cash Deposit with an escrow agent selected by the Debtors (the "Escrow Agent") pursuant to the escrow agreement to be provided by the Debtors to the Interested Parties (the "Escrow Agreement").

E.    **_Review of Bids_**

The Debtors will review those Bids timely submitted and engage in negotiations with those prospective acquirers that submitted Bids complying with the proceeding paragraphs and as they deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid as well as other commercial and competitive considerations.   The Debtors will provide copies of the Bids promptly upon receipt to the Stalking Horse Bidder. The Debtors retain the exclusive right, in the exercise of their business judgment, to determine whether an Interested Party that submitted a Bid may participate in the Auction and will notify the Stalking Horse Bidder of their determination as to which Interested Parties may participate in the Auction on or before **October 17, 2017**.   In the event that the

3

Debtors determine that an Interested Party is not a Qualified Bidder, the Debtors shall notify the Stalking Horse Bidder of the reasons for excluding such Interested Party on or before **October 17, 2017**.

The Debtors will select, in the exercise of their business judgment those Bids qualifying to proceed in the process on or before **October 17, 2017**.

**Only those Bids that (i) were submitted on or before the Bid Deadline, (ii) state that they are binding and irrevocable offers and (iii) are accompanied by a $4,000,000 Deposit that was submitted on or before October 13, 2017, may be deemed Qualified Bids.**

**FOR THE AVOIDANCE OF DOUBT, ANY AND ALL PARTIES SHOULD BE AWARE THAT ANY PARTY THAT IS NOT DETERMINED TO BE A QUALIFIED BIDDER BY OCTOBER 17, 2017 WILL NOT BE ALLOWED TO (1) PARTICIPATE IN THE AUCTION UNDER ANY CIRCUMSTANCES OR (2) SUBMIT ANY OFFER AFTER THE BID DEADLINE.**

The Debtors reserve the right to reject any Bid if the Debtors determine that such Bid does not constitute a Qualified Bid or is otherwise inadequate or insufficient or is otherwise contrary to the best interests of the Debtors.

Notwithstanding anything in these Bidding Procedures, the Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Asset Purchase Agreement shall be deemed a Qualified Bid for all applicable purposes under these Bidding Procedures with respect to the Auction and otherwise.

**The Auction**

A.    *Notice of Auction*

If the Debtors determine in the exercise of their business judgment that they have received a Qualified Bid in addition to the Stalking Horse Bid by the Stalking Horse, the Auction will be held **on October 18, 2017 at 10:00 a.m.** (prevailing Eastern Time) at the offices of Akerman, LLP, 350 E. Las Olas Blvd., Suite 1600 (16th Floor), Ft. Lauderdale, FL 33301. **On or before October 17, 2017 at 5:00 p.m.** (prevailing Eastern Time), the Debtors shall provide each Qualified Bidder (including the Stalking Horse Bidder), with the following: (1) written notice that the Auction is proceeding in accordance with the Notice of Auction previously published by the Debtors, and (2) a copy of the Qualified Bid the Debtors have determined constitutes the highest or otherwise best offer among the Qualified Bids and with which they intend to commence the Auction (the "Pre-Auction Successful Bid"), and (3) the Debtors' valuation methodology for determining the Pre-Auction Successful Bid.

The Auction may be adjourned as the Debtors deem appropriate, in the exercise of their business judgment. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given to all of the Qualified Bidders.

42840367;1
8089948-1

B.    *Attendance and Participation in the Auction*

> a.    In addition to the Debtors and their advisors, the only parties eligible to participate in the Auction shall be: (i) the Stalking Horse Bidder and their representatives and advisors; (ii) those Qualified Bidders who have submitted a Qualified Bid to the Debtors (as well as such Qualified Bidder's advisors and representatives); and (iii) the Office of the United States Trustee for the Southern District of Florida.  The Stalking Horse Bidder and the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

> b.    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Auction.

> c.    Each Qualified Bidder shall have provided the Deposit.

C.    *The Auction Process*

The Auction shall run in accordance with the following procedures:

> a.    The Debtors and their respective professionals shall direct and preside over the Auction.

> b.    On or before **October 17, 2017**, each Qualified Bidder who has timely submitted a Qualified Bid (as determined by the Debtors in accordance with these Bidding Procedures) must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder does not attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bid (as defined below) at the conclusion of the Auction.

> c.    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.  All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

5

d.    At the commencement of the Auction, the Debtors shall announce and describe the terms of the Pre-Auction Successful Bid, previously identified by the Debtors on **October 17, 2017**, as determined by the Debtors in accordance with these Bidding Procedures.

e.    The Debtors may employ and announce at the Auction in the exercise of their business judgment additional procedural rules that are reasonable under the circumstances to obtain the highest or best Successful Bid (e.g., the amount of time allotted to make Subsequent Bids (as defined below)) for conducting the Auction, provided that such rules are (i) not materially inconsistent with these Bidding Procedures, or inconsistent with the Bankruptcy Code or any order of the Bankruptcy Court, and (ii) disclosed to each Qualified Bidder at the Auction.

f.    Bidding at the Auction will begin with the Pre-Auction Successful Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid (a "Subsequent Bid") is submitted by a Qualified Bidder that the Debtors determine, in the exercise of their business judgment, (i) in the case of the first round, is a higher or otherwise better bid than the Pre-Auction Successful Bid by an amount to be determined by the Debtors and (ii) in the case of subsequent rounds, is a higher or otherwise better bid by the minimum bid increment set by the Debtors for each such round than the best bid of the previous round. Each Qualified Bidder must submit a Subsequent Bid that satisfies the minimum bid increment in each round of bidding to continue participating in the Auction. Qualified Bidders shall not be allowed to skip rounds.

g.    The Debtors shall announce the material terms of each Subsequent Bid at the Auction, and shall disclose their valuation of the total consideration offered in each such Subsequent Bid (and the basis for its determination) in order to (a) confirm that each Subsequent Bid meets the minimum bid increment set by the Debtors for the round in which such Subsequent Bid was submitted and (b) to provide a floor for further Subsequent Bids.

D.    ***Identification of the Successful Bidder***

At the close of the Auction, the Debtors, in their reasonable discretion and in exercise of their business judgment shall identify which Qualified Bidder has the highest or otherwise best bid (the "Successful Bid," and such bidder, the "Successful Bidder").

In announcing the Successful Bid, the Debtors shall announce the material terms of such bid. Upon the close of the Auction, the Debtors shall announce the Successful Bidder,

6

and such Successful Bidder shall promptly thereafter submit fully executed revised documentation memorializing the terms of the Successful Bid to the Debtors. The Successful Bid may not be assigned to any party without the consent of the Debtors.

If no Auction is held, then the Stalking Horse Bid shall be deemed to be the Successful Bid and the Stalking Horse Bidder shall be deemed to be the Successful Bidder and the Debtors will proceed to effectuate the transactions as set forth in the Stalking Horse Bid; provided, however, that nothing in these Bidding Procedures in any way limits the ability of the Debtors and the Stalking Horse to mutually agree on improvements in the terms of the Stalking Horse Bid.

## Return of Deposits

Any Deposits submitted by Qualified Bidders will be held in escrow by the Debtors' Escrow Agent. Each Deposit will be forfeited to the Debtors if (a) the applicable Qualified Bidder attempts to modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures or (b) the Qualified Bidder is selected as the Successful Bidder and fails to consummate the sale according to these Bidding Procedures and the terms of its applicable transaction documents with respect to the Successful Bid. The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by the Debtors two (2) Business Days after the receipt by the Escrow Agent of a joint written notice by a Debtor Authorized Officer and the Qualified Bidder stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

The Debtors shall promptly return to the applicable Qualified Bidder any Deposit, plus any interest accrued thereon, accompanying (a) a Bid that the Debtors determine in accordance with these Bidding Procedures not to be a Qualified Bid, and (b) any Qualified Bid that the Debtors do not select as the Successful Bid at the Auction, two (2) Business Days after the close of the Auction, but in no event later than seven (7) Business Days after the commencement of the Auction.

The Debtors and the Qualified Bidder agree to execute an appropriate joint notice to the Escrow Agent for the release of the Qualified Bidder's Deposit, in accordance with the terms of these Bidding Procedures. If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

## Reservation of Rights

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment to alter or terminate these Bidding Procedures, to alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers at any time and without specifying the reasons therefore, to the extent not materially inconsistent with the Bidding Procedures set forth herein.

42840367;1
8089948-1

**End of Auction Process**

   Following the selection of the Successful Bid, (A) the Auction shall be closed, (B) the Debtors shall (i) immediately cease and cause to be terminated any ongoing solicitation, discussions and negotiations with respect to any other bids or proposals for the Acquired Assets and (ii) not solicit any inquiries or bids, or enter into any discussions, negotiations, understandings, arrangements or agreements, relating to any other bid or proposal for the Acquired Assets, and (C) no additional bids or proposals for the Acquired Assets will be accepted or considered by the Debtors, unless and until the termination of the applicable transaction documents with respect to the Successful Bid by and among the Successful Bidder and the Debtors

42840367;1
8089948-1